Catron, Judge,
delivered the opinion of the court. By the act of 1825, ch. 85, the Treasurers are instructed to sell the school lands. The complainants, some of them adults and some minors, inhabitants of a township, filed this bill to prevent the sale.
Any person interested in the subject of litigation, where the numbers are great, may sue. (Coop. Eq. 40. The estate is trust property, holden for the use of minors, and the improvements and timbers of which are threatened with great waste and injury by a division and sale as directed by the act of 1825. If this be void, defendant Francis, can receive no protection under it, and may be treated as one about to seize upon the estate of infants holden in trust, intending to commit waste upon the same. The trustee holding the legal title, refuses to protect the estate, and the cestique trust may well come into equity for aid.
It is useless to examine with minuteness, the question of jurisdiction, as it is the object of the state and the parties interested generally, to have the opinion of this court upon the powers of the legislature to sell the school lands. This was requested at our hands by resolution at the last session, which we will comply with in this opinion.
Tennessee acquired the land in controversy by the compact of 1806. It is in substance, a deed of conveyance; an executed contract, the obligation of which the legislature cannot violate. Does the act of 1825 violate this compact? This raises the question, had Tennessee communicated to her the power and authority to sell the school sections, and part with the legal and trust estate? The United States might well vest in Tennessee asa corporate body, the legal title to the lands, and still restrain her from selling and conveying any part thereof. The *537 contract itself must determine the nature of the title vested. To a correct understanding of the compact, much aid may be derived from the acts and policy of the federal government, in its disposition of the lands ceded to it by the states.
In 1784, Virginia ceded to the United States her north western territory, now forming Ohio, Indiana and Illinois, save a fraction owned by Connecticut. In 1785, Congress passed the first law making regulations to dispose of the public lands. They were directed to be laid offin town, ships of six miles square, and these to be subdivided into thirty-six sections of a mile square.
Perhaps no act has ever been passed by Congress, of equal probable influence upon the destinies of the American people. Upon it are based individual titles to a large portion of this continent, destined to become a few generations hence, as mighty in men and means, as any country of equal'extent on the globe; and it has surface enough for a splendid empire. The distinguished patriots who were of the Congress of 1785, foresaw this; they foresaw the necessity, that a people making the experiment of self-government must be educated, least their rights should ere long fall a sacrifice to the military usurper, or profligate demagogue; that the idea of self-government for any length of time, by an illiterate mass of people, was not only improbable, but absurd; that illiterate men could not frame constitutions and laws to govern themselves by, or execute them when adopted; that they would not understand or appreciate them sufficiently for their preservation; nor would they have morals and elevation of character, the only basis of patriotism, to appreciate or preserve their freedom; that ignorance and depravity had been the handmaids to despotism through all ages past, and must he so through all ages to come; and that when this mighty republic should fall, mainly to this cause would be traced its overthrow.
The Congress of 1785 was about to dispose of, and forever, the public domain, the population of which was presently to form a strong arm of the union; a severance *538 of this from the body politic might, and in all probability would destroy it. The main pillar of the political edifice, (the means of education,) was then in the power of Congress, and means of all others the most permanent and most likely to prove beneficial through time to come, lands, of good quality and convenient locality.
From its paramount importance, a provision for the promotion of education became a part of the settled policy of the government in the disposition of the public .lands. By the act of 1785, it is provided, “that there shall be reserved, lot No. 16, of every township for the maintenance of public schools within the township; also, one-third part of all gold, silver, lead or copper mines? to be sold or otherwise disposed of as Congress shall hereafter direct.” In the surveying and sale of all public lands, the United States, from that time to this, have reserved the 16th section “for the maintenance of public schools within the township.”
In 1787, the justly celebrated ordinance for the government of the north western territory, was enacted by Congress. Amongst other things it is declared, “that religion, morality and knowledge, being necessary to good government, and the happiness of mankind, schools, and the means of education shall forever be encouraged, in the territory.”
In 1789, North Carolina passed the cession act, transferring to the United States what is now the state of Tennessee. This was accepted by Congress in 1790. The 4th condition stipulates, that the people of the ceded territory shall enjoy all the privileges, benefits and advantages set forth in the ordinance for the government of the northwestern territory of the United States; that Congress shall never bar or deprive them, or any of them, of privileges which the people in the territory west of the Ohio enjoy.
Every promise set forth in the ordinance was part of our contract with the United States; one of these was, that schools and the means of education should be forever encouraged; not by words, but by useful means.
*539 We were to receive all the privileges and benefits the people north west oí the Ohio enjoyed. What did they enjoy? The 16th section of every township for the use of public schools, within the township. Thus the United States were bound, by contract, to furnish us the means of education, and that forever, and to reserve the 16th section for the use of public schools within each township. Upon this consideration, with others, did North Carolina part with the soil and sovereignty of the country. Suppose she had sold to individuals, would not a court of chancery have enforced this part of the contract in favor of the cestique trust, the people of the ceded territory? It cannot be denied.
Thus stood the rights of our people, and their claim upon the United States in 1806. By the compact of that year, to which the United States, Tennessee and North Carolina were parties, amongst other things it was agreed, that the legal title to the lands north east of a certain line be vested in the state of Tennessee; that 100,000 acres should be laid off in one tract, south of French Broad and Holston, for the use of two colleges to be established by the legislature; also, 100,000 acres in one other tract, for the use of Academies, one in each county, to be established by the legislature. These lands, it was stipulated, should be subject tov the disposition of the legislature of the state, but should not be granted or sold for less than two dollars per acre. “The proceeds of the sales shall be vested in funds, for the respective uses aforesaid forever,” says the compact.
“And the state of Tennessee shall moreover, in ' issuing grants and perfecting titles, locate six hundred and forty acres to every six miles square in the territory hereby ceded, where existing claims will allow the same, which shall be appropriated for the use of schools, for the instruction of children forever.'
The United States held the legal title to the lands referred to, subject to the stipulations of the cession act of 1789; they were bound, so far as a sovereignty can be bound, to furnish the means of education, and forever; *540 they were bound to furnish the 16th’section, for the maintenance of public schools within the township.
Thus incumbered', the legal title was vested in the state 0f Tennessee, with this positive further restriction, that Tennessee should locate one section in every township, if so much ungranted land might be found therein, for the use of schools, for the instruction of children forever.— The first duty of Tennessee was to elect the school section, if so much ungranted land was found in the township; when elected, it was holden by the state in her corporate capacity, not to sell (congress never communicated the power of alienation of the school sections,) but to locate and hold in trust the land, and as such trustee, to cause to be appropriated the land, and the rents, issues and profits thereof, for the use of schools for the instruction of children- forever, through all ages to'come, whilst her corporate capacity endured.
Such is the plain language of the act; such is the undoubted inference to be drawn from the context provision, authorizing the sale of the college and academy lands; such is the conclusion to be drawn from the obligation resting upon the United States by force of the cession act of 1789; such is the conclusion to be drawn from the construction given to the compact of 1806 by the legislature of Tennessee, from 1806 up to 1825. For near twenty years it was not imagined the school sections could be sold.
In 1817, the legislature ordered formal grants to be made out for the school sections, reciting, that in conformity to the compact of 1806, “ there is granted by the state of Tennessee, for the use of schools for the instruction of children, a tract of land situate, &c. which grant shall be sealed with the great seal of the state; shall be recorded by the register in the same manner as other grants issued by the state are, and shall be as effectual to vest the titles to said lands for the use of schools forever, against any grant issued by the state of Tennessee.”
As evidence of the nature of the trust reposed in Ten *541 nessee by the compact, and as evidence of the particular sections elected for the use of schools, no declaration could be more conclusive than the patent. It may vest in the inhabitants of each township, for which the land was located, a title in fee, not subject to be defeated by the legislature. That it was intended to do so, there can be but little doubt. On this point, however, we wish not to be understood as giving any matured opinion; It is not probable the state intended to part with her powers over the school lands as trustee, nor do we imagine she has done so by the act of 1817. It is a public matter, and must be subject to legislative control.
We are of opinion, that the act of 1825 clearly violates the obligations of the compact of 1806 imposed upon the state of Tennessee; and that the act, so far as it orders the school sections to be divided, sold and granted to purchasers, is unconstitutional and void. We therefore reverse the decree, overrule the demurrer, and remand the cause to the chancery court to be proceeded in.
Decree reversed.