UNITED STATES of America

v.

2,923.23 ACRES OF LAND, MORE OR
LESS, situate IN MONROE COUNTY,
TENNESSEE and Benjamin H. Rogers,
et al.

Civ. A. No. 7280.

United States District Court,
E. D. Tennessee, N. D.

April 29, 1974.

John L. Bowers, Jr., U. S. Atty., Knoxville, Tenn., for plaintiff.

Kyle R. Weems, Chattanooga, Tenn., J. Lewis Kinnard, Kinnard & Wilson, Madisonville, Tenn., Andrew Johnson, Hugh W. Morgan, Kramer, Dye, McNabb & Greenwood, Knoxville, Tenn., Lee & Pennington, Madisonville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

This action was originally filed by the United States on January 4, 1971 to condemn some 2,923 acres of land in Monroe County, Tennessee. It is presently before the Court upon objections, on the part of the heirs of W. A. Rogers (heirs) and the Monroe County Board of Education (School Board), to a finding by a Special Master. The controlling issue is whether the Master's finding, which vested in the heirs title to the Northeast, Northwest and Southwest quarter sections of Section Sixteen of the Ocoee District (presently the Fifth District) in Monroe County, Tennessee, and which further vested in the School Board title to the Southeast quarter section of the same tract, is clearly erroneous. See Rules 53 and 71A of the F. R.Civ.P. Both parties claim title to the entire section, or some 500 to 600 acres of land condemned by the United States in this action.

The land in question, namely, Section Sixteen of the Ocoee District, is part of certain lands that were ceded to the State of Tennessee by the United States. The record reflects that Congress in 1789 approved the cession of certain lands by the State of North Carolina to the State of Tennessee. By Act of 1806 Congress further approved the cession of all the lands north and east of the "Congressional reservation line" to the

State of Tennessee upon the express limitation that 640 acres in every six miles square be set aside for school purposes forever. In the same year, the Tennessee legislature incorporated such limitation as follows:

"That after ascertaining the claims as aforesaid, the principal surveyor shall cause to be laid off and surveyed . . . six hundred and forty acres of land, in one or more tracts, which shall be fit for cultivation and improvement, and which shall be as near the centre (sic) of each section as existing claims and the quality of the land will admit, which shall be appropriated for the use of schools . . . forever. . . ."

Acts of 1806, Ch. 1 sec. 6 (Scott's Laws of Tennessee, Vol. 1, pp. 872–893)

In 1807 the Tennessee legislature made it unlawful for any person to enter, survey or obtain a grant for any tract that had theretofore been marked or set aside for school purposes and further declared that any attempted entry or grant ". . . shall be null and void . . ." (Acts of 1807, Ch. 1, Sec. 41, Scott's Laws of Tennessee, Vol. 1, p. 1002).

Thus, legal title to these lands was vested in the State as trustee for common schools of the township forever, and any disposition of school lands in derogation of this trust would be null and void. See e. g. Lowry v. Francis, 10 Tenn. 534 (1831).

In 1836 the Cherokee nation of Indians ceded to the United States, which in turn ceded to the State of Tennessee, that tract of land known as the Ocoee District. Pursuant to this cession, and in conformity with federal legislation which set aside the Sixteenth Section of each township owned by the government as school lands, the Tennessee legislature on October 18, 1836 provided:

"In each township the surveyor shall lay off and distinguish in his general plan . . . the *sixteenth*

*section*, if fit for cultivation, and if not, then the section nearest thereto, which shall be fit for cultivation, to be reserved for the use of schools, in such township forever."

Acts of 1836, Ch. 2, Sec. 6, para. 13.

Thus, it appears that until 1843, the State of Tennessee held in trust those sixteenth sections which were set aside for school purposes and further that no disposition could validly be made by the State or any other individual in derogation of that trust.

In that year, however, Congress authorized the state to convert school lands into a fund for support of the schools, provided the people consented thereto. (Acts of 1843, Ch. 346). Pursuant to this authorization the Tennessee legislature, by Acts of 1844 and 1846, made specific provisions for the disposition of common school lands and set forth the procedure by which such disposition could be effectuated. (Acts of 1843–1844, Ch. 104, Sec. 2, pp. 122, 123; Acts of 1845–1846, Ch. 121, pp. 188–90). Accordingly, if lands designated as school lands were sold or otherwise disposed of, strict compliance with the legislative procedure was required and any disposition not in compliance therewith was ineffective to pass title. See, e. g. Martin and Duncan v. State, 29 Tenn. 157 (1849); Goodman v. Mining Co., 38 Tenn. 172 (1858).

The School Board urged before the Master that it was entitled to the entire Sixteenth Section of the Ocoee District on the grounds that (1) the Acts of 1836 creating the district entitled them to that section; and (2) there was no grant from the State of Tennessee divesting them of such lands. The heirs urged below that they were the successors in title to the Northwest and Northeast and Southwest quarter sections of Section Sixteen, the original grant being signed by the Honorable Neill S. Brown, Governor of Tennessee, in 1842 and noted on the back as being recorded in the Register's Office in 1849. This grant was never found in the Monroe County Register's Office but was found in the attic of the Monroe County Chancery Court as an exhibit to a case styled Calloway v. Calloway. They further urged that title was vested in them by reason of adverse possession. T.C.A. §§ 28–205, 28–206.

The Special Master found that the claim of the School Board to the Northeast, Northwest and Southwest quarter sections of Section Sixteen was insufficient on the grounds that (1) those quarter sections were not designated by the Ocoee District Surveyor as school lands and (2) the grant from the State of Tennessee was a valid grant issued under its sovereignty powers.

On the other hand, he found that there was no evidence to support a conclusion that the Southeast quarter section lost its designation as school lands since there was shown neither a grant of said quarter section nor adverse possession on the part of the heirs or their predecessors in title.

The Court observes that the original plat of this fractional part of the Ocoee District is not represented in Ocoee District plat book on file at the Tennessee State Library and Archives in Nashville (Exhibit No. 71). Thus, neither could the Master, nor can the Court, say with certainty that Section Sixteen of the Ocoee District, in whole or in part, was in fact set aside by the surveyor as school lands. A conclusion can only be reached upon an examination of the evidence presented and applicable state law.

■ We agree with the Special Master's conclusion that, under the Acts of 1806, 1807, and 1836, there is a presumption that all lands in Section Sixteen of the Ocoee District were set aside as school lands. However, this presumption may be overcome by a showing that such lands were not so set aside by the surveyor for such purposes or that they lost their designation as school lands in

compliance with the Tennessee statutes. Indeed, it would be impossible for a party to establish title to these lands if such presumption could not be overcome by contrary evidence.

■ From the testimony developed at the hearing, and from other documentary evidence, the Master found that the Northeast, Northwest, and Southwest quarters of Section Sixteen "plunge precipitously down the slope of the mountainside" and further that said tracts were not fit for cultivation. Accordingly, he held that these three quarter sections were not established by the surveyor of the Ocoee District as school sections. We concur in this finding and conclusion.

■ He observed that at the time of the original grant from the State to Calloway in 1842 it was unlawful for even the State to dispose of these lands. However, since no survey records could be found in the State Archives in Nashville and since this portion of the section was illsuited for cultivation, he held that the grant issued under the sovereignty powers of the State and was valid.

Upon a careful review of the record, we cannot say that the Master's findings regarding the ownership of these three quarter sections is clearly erroneous. While there may exist some conflict as to whether these lands were in fact set aside for school purposes, the findings appear to be substantially supported by the record and the law.[1]

■ As to the remaining quarter section, namely, the Southeast Quarter of Section Sixteen, the heirs here contend that title vested in their predecessor by virtue of his paying taxes on the property for a period exceeding 20 years. T. C.A. §§ 28–209, 28–210. Their claims, as presented below, under T.C.A. §§ 28–205 and 28–206 are clearly refuted.

The deraignment of title to this parcel proceeds from a deed from one John M. Taylor et ux to John Deavers et ux in 1920. The only other deed appearing is that from the Commissioner of Taxation to W. A. Rogers in 1942 which issued under the applicable delinquent tax laws of Tennessee. The chain of title prior to the Taylor to Deavers deed of 1920 is absent from the record.

The evidence shows, and the Master found, that this parcel is situated at the top of the mountain where the slope is much more gentle, and thus more suited for cultivation, notwithstanding its remoteness. On the other hand, there was no showing that W. A. Rogers, or any of his predecessors in title, adversely possessed the land under the laws of Tennessee. T.C.A. §§ 28–205, 28–206, see also Derryberry v. Ledford, 506 S.W.2d 152 (Tenn.App.1973) cert. den. March 4, 1974. To the contrary, there is evidence in the record that Dr. Rogers knew, or at least suspected, that the Southwest quarter section was school lands.

We are of the opinion that the heirs' reliance on T.C.A. §§ 28–209, 28–210 is likewise misplaced since school lands could be disposed of only according to the procedures established by the Tennessee legislature under the Acts of 1844 and 1846. There is absolutely no evidence in the record that such procedure was followed in this case. Accordingly, we hold that the Master's finding that title to the Southeast quarter section of Section Sixteen of the Ocoee District is supported by the record.

The School Board urges that, from a practical standpoint, it is inconceivable that the Master could, on the one hand, find that three quarters of Section Sixteen were not set aside as school lands by the surveyor and, on the other hand, find that the Southeast quarter section was so designated since this one quarter

---

1. For a general survey of the laws as they existed prior to 1844 see Martin v. State, supra; Goodman v. Mining Co., supra; Miller v. School Commissioners, 80 Tenn. 75 (1883). See also Sampson v. University of Nashville, 32 Tenn. 600 (1853); Puckett v. State, 33 Tenn. 355 (1853).

section represents only some 160 acres, more or less, and abuts upon the boundary line between North Carolina and Tennessee. They further argue that notwithstanding the fact that most, if not all, of the lands in this portion of Monroe County are mountainous, the record reflects that the surveyor did set aside other sixteenth sections in the immediately adjacent townships for school purposes. In support of these contentions, the Board relies upon, inter alia, a letter from the Director of the Tennessee State Archives (Exhibit No. 71), testimony of certain witnesses that these lands were thought to be school lands, and a map introduced as an exhibit to the testimony of witness Bodenheimer. (Exhibit No. 75).

■ The record shows that the Special Master gave careful consideration to the evidence presented. The contention of the School Board regarding his resolution of the conflicts in the evidence is without merit. As to its reliance upon Exhibit No. 75, we conclude that this evidence is, at best, only some indication that the lands in question were set aside as school lands. This map is merely a composite reproduction of other maps submitted in 1934 to the printing firm of Sehorn & Kennedy for compilation. The witness admitted that he could not vouch for the correctness of the information contained thereon since, "I just made that from a map that was brought to me." (Tr. p. 12). Accordingly, it is the opinion of the Court that the Master did not err in failing to rely upon this evidence to support a finding that the entire Sixteenth Section was established for school purposes.

As previously indicated, had the Court below had access to the original survey records of the Sixteenth Section of the Ocoee District, the issues here presented would have been more readily subject to a precise resolution. We conclude that the Master's findings are not clearly erroneous. Accordingly, his findings and conclusions are affirmed.